BRIAN W. BOSCHEE, ESQ.
Nevada Bar No. 07612
bboschee@nevadafirm.com
JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
jboyle@nevadafirm.com
COTTON, DRIGGS, WALCH,
HOLLEY, WOLOSON & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:  (702) 791-0308
Facsimile:  (702) 791-1912

STEVEN M. AUVIL*
steven.auvil@squiresanders.com
JOHN J. THUERMER*
john.thuermer@squiresanders.com
SQUIRE SANDERS (US) LLP
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8023
Facsimile: (216) 479-8780

RACHAEL A. HARRIS*
rachael.harris@squiresanders.com
SQUIRE SANDERS (US) LLP
1200 19th Street, N.W., Suite 300
Washington, D.C. 20036
Telephone: (202) 626-6206
Facsimile: (216) 626-6780

*Pro Hac Vice Applications Pending

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| RUBBERMAID COMMERCIAL PRODUCTS LLC, | CASE NO.:  2:13-cv-02144-GMN-(GWF) |
| Plaintiff, | **MOTION AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | |
| TRUST COMMERCIAL PRODUCTS and TAIZHOU YINSHAN BRUSH CO., LTD | |
| Defendants. | |

- 1 -

Pursuant to the Federal Rules of Civil Procedure, Rule 65, the Patent Act, 35 U.S.C. § 283, the Copyright Act, 17 U.S.C. § 502, and Local Rule 7-5, Plaintiff Rubbermaid Commercial Products LLC ("Rubbermaid") respectfully moves the Court for an emergency *ex parte* temporary restraining order and a preliminary injunction against Defendants Trust Commercial Products ("Trust") and TaiZhou YinShan Brush Co., Ltd. ("Yinshan") (collectively "Defendants").  This Motion is based upon the pleadings and the records on file herein, the Declaration of Neil R. Eibeler In Support of Plaintiff's Motion for Temporary Restraining Order and For a Preliminary Injunction, the Supplemental Declaration of Neil R. Eibeler In Support of Plaintiff's Motion for Temporary Restraining Order and For a Preliminary Injunction, and the oral argument of counsel, if any.

In support of this Motion, Rubbermaid attaches Exhibits A–D, respectively:  (A) Declaration of Neil R. Eibeler (and attachments thereto); (B) Supplemental Declaration of Neil R. Eibeler (and attachments thereto); (C) a Certification in Support of Rubbermaid's *Ex Parte* Motion for Temporary Restraining Order; and (D) [Proposed] Order Granting the *Ex Parte* Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

After years of maintaining a business relationship where Defendants manufactured and sold brushes and other small products to Rubbermaid, Defendants are now willfully infringing Rubbermaid's U.S. design patents and flagrantly coping and distributing Rubbermaid's copyrighted works.  This is not a case of mistaken or inadvertent copying or infringement. Instead, Defendants are brazenly disregarding Rubbermaid's intellectual property rights and soliciting Rubbermaid customers to buy its infringing goods.  At this time,  Defendants are exhibiting and offering to sell these illicit goods at a trade show a short distance from this courthouse, with the manifest goal of taking orders for these goods and subsequently fulfilling

these products orders and shipping the illicit goods to the United States.  Rubbermaid hereby beseeches this Court to enjoin this unlawful conduct before Rubbermaid suffers any additional irreparable harm.

### GOOD BASIS FOR OBTAINING EMERGENCY *EX PARTE* RELIEF

Defendants have appeared in this District for the purpose of exhibiting their infringing products and catalogs at the ISSA trade show, which is currently being held at the Convention Center in Las Vegas.  In just two-days-time, the trade show will end, and Defendants likely will have solicited customers, offered their infringing products for sale, and will be on their way back to China, where they will manufacture their products and import those goods back to the United States and elsewhere.  The circumstances surrounding the Defendants' presence in this District and their willful infringement provides Rubbermaid good cause to seek emergency *ex parte* relief.  Accordingly, Rubbermaid asks that this Court to restrain Defendants from (1) making, using, selling, offering to sell, and importing into the United States commercial products covered by U.S. Patent Nos. D474,570, D487,604, D618,418, and D618,419, and colorable imitations thereof, (2) exhibiting any products at ISSA that infringe U.S. Patent Nos. D474,570, D487,604, D618,418, and D618,419, and colorable imitations thereof; and (3) distributing or disseminating any work, including Defendants' Catalog that infringes Rubbermaid Brochure Copyright.

An *ex parte* order preserves the status quo ante and prevents irreparable harm. *See Granny Goose Foods, Inc., v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).  This is precisely the type of relief Rubbermaid seeks here.  Rubbermaid seeks an order restraining Defendants from infringing Rubbermaid's Design Patents and from infringing Rubbermaid's Catalog Copyright at the ISSA.  In other words, Rubbermaid is seeking this Court's assistance is preserving the status quo ante and preventing irreparable harm until the Court is able to hold a hearing on these issues.

Courts may grant an *ex parte* temporary restraining order when: (1) immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard; and, (2) the moving party demonstrates the reason notice should not be required. Fed. R. Civ. P. 65(b).  And courts recognize the need for *ex parte* temporary restraining orders in intellectual property cases.  *See generally, Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991). Indeed, this Court has granted an *ex parte* TRO under similar circumstances involving foreign companies appearing at Las Vegas trade shows and offering to sell their infringing goods.  *E.g., Otter Prods. v. Anke Group Indus. Ltd.,* 2:13-cv-00029, 2013 U.S. Dist. LEXIS 159755,*6 (D. Nev. Jan. 8, 2013); *NIKE, Inc. v. QiLoo Int'l Ltd.,* 2:12-cv-00223 (D. Nev. 2012).

Here, there is good reason to order the requested relief without providing notice.  Other than their presence at ISSA, Defendants have no known presence in the United States. (Declaration of Neil R. Eibeler Decl. ("Eibeler Decl.") at ¶ 63.)  Defendants are attending ISSA to, among other things, generate business and develop and maintain business relationships with key accounts in the United States.  Thus, when ISSA ends on November 21, 2013, Defendants will presumably leave the United States with the Accused Products, their Catalog, and orders from United States customers for those infringing products.  (*See id.* at ¶ 62.)  A temporary restraining order is necessary to immediately enjoin Defendants' from offering for sale and selling the infringing products and distributing the catalog they plagiarized, thereby stopping Defendants in their tracks.

Further, if Defendants are provided with advance notice of this motion, there is a significant likelihood that Defendants will remove or destroy evidence (including the Accused Products and Catalog), and will simply conceal—but not halt—their unscrupulous actions at ISSA.  Defendants are engaged in willful patent and copyright infringement. Indeed, Rubbermaid will likely succeed on proving that Defendants "acted despite an objectively high

likelihood that its actions constituted infringement of a valid patent" and that such a risk was "either known or so obvious that it should have been known" to Defendants.  *In re Seagate Tech.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  Here, Defendants knew or should have known of Rubbermaid's patent and copyright rights—especially in light of Yinshan's prior relationship with Rubbermaid.  Moreover, and as more fully herein described, this is not a case in which there is merely a colorable claim of infringement; this is a case in which a competitor has deliberately and knowingly copied and infringed Rubbermaid's design patents and copyrighted work. Defendants' flagrant disregard for Rubbermaid's intellectual property rights demonstrates a wanton disregard for U.S. law and further bolsters the need for *ex parte* relief.  Accordingly, this Court has granted *ex parte* relief where the Defendants have made their presence in this District at a well-attended trade show and were engaged in willful and deliberate infringing activities at the show.  *See*, *e.g.*, *Otter Prods.*,  2013 U.S. Dist. LEXIS 159755 (granting *ex parte* preliminary relief where the Defendants were engaged in selling and offering for sale obviously infringing products at a trade show in Las Vegas).

Further, Defendants' rights will be adequately protected. To ensure that Defendants have proper notice of the temporary restraining and request for preliminary injunction, Rubbermaid will effectuate personal service of the requisite documents at the trade show, and will promptly provide Defendants with notice through electronic mail and international FedEx to Defendants' postal address in China.

Finally, Rubbermaid will post a security as set forth in Fed. R. Civ. P. 65(c).  Given the expediency of Rubbermaid's request for relief, Rubbermaid proactively obtained a surety bond for $50,000 and is prepared to post the bond immediately, even though a lesser or minimal bond would be appropriate under the circumstances because the intellectual property rights at issue here are undoubtedly Rubbermaid's and Defendants simply have no countervailing rights to

protect against any prospective losses through the posting of any level of a substantial bond. This Court has the discretion to set a bond amount at an appropriate level.  *GoTo.com Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (citing Rule 65(c)).  Because obtaining a replacement bond could result in another day of delay, Rubbermaid asks that the Court set the bond at an amount not to exceed $50,000.

## STATEMENT OF FACTS

### I.      The Rubbermaid Asserted Patents, Copyright, and Relevant Products

Rubbermaid is the market leader in innovative durable facility maintenance solutions. (Eibeler Decl. ¶ 5.)[1]  Within this market, Rubbermaid is known for its best-in-class quality and breadth of product offerings, and Rubbermaid is a leader in innovative products.  (*Id.*)  In recognition of Rubbermaid's innovation, Rubbermaid has received a number of awards and accolades.  For example, Rubbermaid won a 2011 ISSA Innovation Award for its HYGEN™ Clean Water System.  The HYGEN™ Clean Water System is a breakthrough floor-cleaning product that features an integrated water filter, which allows cleaning solutions to be used for longer durations during a cleaning task.  (*Id*. at ¶ 6.)  The ISSA Product Innovation Awards offer cleaning-industry distributors, building service contractors and in-house service providers the chance to vote for the most innovative products showcased at ISSA.  *See* http://www.issa.com/?id=tshow_issa_interclean_las_vegas_2013_innovation_showcase.    This year, Rubbermaid's Collapsible X-Cart is on the ISSA Innovation Awards ballot.  (Eibeler Decl. ¶ 6.)

Particularly relevant to this lawsuit, Rubbermaid has expended significant time and

---

[1] This Court may rely on statements made in the Eibeler declarations, including those statements that may be hearsay or may otherwise constitute evidence that would be inadmissible at trial.  See *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction."); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.")."

resources creating innovative housekeeping carts, material handling carts, and utility carts. Rubbermaid markets and sells these products throughout the world and in every state of the United States. (*Id.* at ¶¶ 7, 8.) It makes those sales through a variety of distributors, wholesalers, and catalogers, including large hotel chains and prominent hotels such as the Wynn Hotel. (*Id.* at ¶ 8.)

Defendants are infringing four design patents owned by Rubbermaid that claim the ornamental design for various types of carts. The United States Patent and Trademark Office (the "PTO") issued these patents after finding them to meet the requirements for patent protection, and the inventors assigned these patents to Rubbermaid. (*Id.* at ¶¶ 13, 22, 29, and 38.) These patents at issue are: (1) U.S. Design Patent No. D474570, (the "'570 Patent"); (2) United States Design Patent No. D618418 (the "'418 Patent"); (3) United States Design Patent No, D618419 (the "'419 Patent"); and (4) United States Design Patent No. D487604 (the "'604 Patent"). The '570, '418, '419, and '604 Patents are collectively referred to as the "Asserted Patents."[2] The validity of the Asserted Patents has never been challenged by anyone, including Rubbermaid competitors. (*Id.*.)

Rubbermaid practices the Asserted Patents by creating and selling various products that embody the ornamental designs claimed in the Asserted Patents. (*Id.* at ¶ 9.) For example, Rubbermaid's Full Size Housekeeping Cart (part of its line of Class Housekeeping Carts) embodies the design shown in the '570 Patent. (*Id.* at ¶ 14.) The Classic Housekeeping Carts are used by hotels such as the Wynn. (*Id.* at ¶11.) Since 2002, the Classic Housekeeping Carts have become a significant revenue source for Rubbermaid. Sales of the cart generally fluctuate between $3,000,000 and 5,000,000 per year (*Id.* at ¶ 12.) Rubbermaid consistently claims the top or second-best market share in the housekeeping cart product category. (*Id.*)

---

[2] The Asserted Patents are attached to the Eibeler Decl. at Exs. 3, 5, 6, and 7, respectively.

Rubbermaid also makes a number of material handling carts, which are typically used by electricians, tradesmen, and maintenance professionals to transport various tools and supplies. (*Id.* at ¶ 19.)  Rubbermaid is the market leader in the material handling carts market.  (*Id.* at ¶ 21.)  Several of the Rubbermaid TradeMaster® Mobile Cabinets and Work Centers, one type of material handling cart, embody the cart shown in the '604 Patent.  (*Id.* at ¶ 23.)  In the United States alone, Rubbermaid has sold thousands of these TradeMaster® Mobile Cabinets and Work Centers, typically generating about $1,000,000 per year in sales.  (*Id.* at ¶ 21.)

Rubbermaid's utility cart product line also includes the Flat Shelf Cart (which embodies the design shown in '418 Patent) and the Heavy Duty Utility Cart (which embodies the design of the utility cart shown in '419 Patent).  (*Id.* at ¶¶ 30, 39.)  Both carts are used to transport various objects, and they are used by a variety of customers.  (*Id.* at ¶ 27.)  The combined domestic sales of the Flat Shelf Carts and Heavy Duty Utility Carts have exceeded $15,000,000 per year.  (*Id.* at ¶ 28.)

Rubbermaid relies on brochures and catalogs to promote its products.  (Supplemental Declaration of Neil R. Eibeler ("Supp. Eibeler Decl.") at ¶ 2.)  For example, Rubbermaid created and authored a brochure (the "Rubbermaid Brochure") that contains images, photographs, artwork and textual descriptions of its products.  (*Id.* at ¶ 3; *see also id.*, Ex 1.)  The Rubbermaid Brochure is the original, creative, and innovative work of Rubbermaid employees, who created the catalog in the scope of their employment.  (*Id.* at ¶ 6.)  The Rubbermaid Brochure contains copyrightable material, and to further protect this original work, Rubbermaid applied for copyright protection of the Rubbermaid Brochure on November 14, 2013.  (*Id.* at ¶ 7.)

The Rubbermaid Brochure, which contains images, photographs, artwork, designs, and verbal descriptions of Rubbermaid's material handling carts discussed above, is widely disseminated throughout the United States and the world.  (*Id.* at ¶ 4.)  For example, the

Brochure and the catalog reflecting the Brochure's contents are available at trade shows and on Rubbermaid's website. (*Id*.).

## II. Background on Defendants

Defendants in this action are two China-based companies that manufacture, sell, and offer to sell commercial products, including the Grandmaid Housekeeping Carts, Bitbar Mobile Work Centers, Bitbar Utility Carts, and Bitbar Flat-shelf Carts (the "Accused Products").[3]  For several years, Rubbermaid sourced toilet brushes and other small products from Defendant Yinshan for resale under Rubbermaid brands.  (Eibeler Decl. at ¶ 56.)  At some point in time unknown to Rubbermaid, Yinshan sought to compete (unfairly, it turns out) against Rubbermaid, using the brand name "Trust" and "Trust Commercial Products" in connection with the Accused Products. (*Id*. at ¶ 57.)  In light of the infringing activities and Defendants deceit, Rubbermaid decided to terminate its business relationship with Defendant Yinshan.  (*Id*. at ¶ 56.)

As part of their illicit activities, Defendants promoted the Accused Products at ISSA trade shows in Shanghai, China, in April 2013, and in Amsterdam, Netherlands, in May 2012, using promotional material with content very similar to the Rubbermaid Brochure.  (*Id*. at ¶ 54 and Ex. 10.)  Rubbermaid also has since been informed that Defendants currently tout their prior relationship with Rubbermaid to potential customers, and promise that Defendants' products are of the same quality as Rubbermaid products.  (*Id*. at ¶ 57.)  Rubbermaid customers have pointed to the availability of the Accused Products when negotiating the purchase price with Rubbermaid.  Therefore, the availability of the Accused Products lowers the purchase price Rubbermaid could command in a fair market. (*Id*. at ¶ 58.)  Several of Rubbermaid's component

---

[3] The model numbers for the Grandmaid Housekeeping Carts are 5021, 5022, and 5023 (the corresponding order numbers are 650218881, 650228881, and 650238881, respectively).  The model numbers for the Bitbar Mobile Work Center are 4031, 4032, and 4033 (the corresponding order numbers are 640318881, 640328881, and 640338881, respectively).  The model numbers for the Bitbar Utility Carts are 4041 and 4044 (the corresponding order numbers are 640418881 and 640448881, respectively).  The model numbers for the Bitbar Flat-shelf Carts are 4045 and 4047 (the corresponding order numbers are 640458881 and 640478881).  *See* Eibeler Decl., Ex. 4 (Defendants' catalog).

suppliers have reported that Defendants have contacted them seeking to purchase the exact same parts Rubbermaid uses in its products.  (*Id.* at ¶ 59.)

### III.   Defendants' Presence at ISSA

#### A.   The ISSA Trade Show

From November 18–21, 2013, the ISSA/Interclean North America tradeshow ("ISSA")—one of the nation's largest trade shows for the cleaning industry—is taking place in Las Vegas, Nevada. (Eibeler Decl. at ¶ 43.)   Trade shows like ISSA are important for companies like Rubbermaid to showcase innovative their products and continue to build distribution channels. (*Id.* ¶ 46.).  Rubbermaid has attended almost every ISSA show for the last twenty years. (*Id.*).

Companies attend ISSA to exhibit their products and conduct business.  In other words, exhibitors come to ISSA to solicit new customers, take product orders, and generally offer their products for sale.  In some circumstances, a deal may be completed on the show floor.  (*Id.* at ¶ 51.)  At other times, deals are completed off-site at separate conference or hotel rooms.  (*Id.*)

Thus, Defendants—who spent thousands of dollars to fly to Las Vegas from China, to bring products with them to showcase in their book, and to rent a booth at ISSA—are exhibiting at ISSA with the purpose of conducting business and offering their products for sale.  (*Id.* at ¶ 53.)  Indeed, Defendants paid approximately $2,500 to rent a booth at ISSA, which Defendants set up with products and a stack of catalogs to distribute to potential customers.  (*Id.* at ¶ 49, Ex. 8).  Two employees of Defendants were present in their booth, and were speaking with potential customers about Defendants' products.  (*Id.*)  Defendants were also distributing their catalog to potential customers who visited the booth.  (Supp. Eibeler Decl. at ¶ 4).  With the exception of Defendants' temporary presence in Las Vegas during the ISSA trade show, Rubbermaid, after a reasonable investigation, cannot locate any domestic presence or assets for Defendants. (Eibeler Decl. at ¶ 63.)

### B.     Defendants' Accused Products

Defendants make a number of products that infringe Rubbermaid's patents.  Rubbermaid, however, has proactively focused this motion on the four products that present the greatest harm to its business.   Images of these products, along with the Rubbermaid product and the corresponding Asserted Patent, are shown in Table 1:

**TABLE 1**

| RUBBERMAID PRODUCT | ASSERTED PATENT | ACCUSED PRODUCT |
|---|---|---|
|  Rubbermaid Full Size Housekeeping Cart |  '570 Patent |  Defendants Grandmaid Housekeeping Cart |
|  Rubbermaid TradeMaster® Mobile Cabinet and Work Center |  '604 Patent |  Defendants Bitbar Mobile Work Center |
|  |  |  |

| RUBBERMAID PRODUCT | ASSERTED PATENT | ACCUSED PRODUCT |
|---|---|---|
| **Rubbermaid Flat Shelf Cart** | **'418 Patent** | **Defendants Bitbar Flat-Shelf Cart** |
| **Rubbermaid Heavy Duty Utility Cart** | **'419 Patent** | **Defendants' Bitbar Utility Cart** |

Defendants are also distributing, including at their booth at ISSA, a catalog that contains pages that copy the content of the Rubbermaid Brochure.  (Eibeler Suppl. Decl. at ¶ 4.)  Those copied pages of Defendants' Catalog are virtually identical to the images, photographs, artwork, and textual descriptions of the Rubbermaid Brochure.   This copying was done without authorization from Rubbermaid.    (*Id.* at ¶ 12).    While the number of similarities is overwhelming, two particularly egregious examples follow:

**EXAMPLE 1**

| RUBBERMAID BROCHURE[4] |
|---|



**CASTERS TO MEET YOUR NEEDS**

We rigorously tested and selected the optimal casters for each of our products—creating the most efficient and durable material handling solutions for your specific requirements. (See caster options on page 16.)

**POLYOLEFIN**
Hardened polyolefin casters roll more than soft tread casters. Non-marking, impact and chemical resistant casters won't flat-spot under static loads or pick up metal shavings, nails, and other debris. Excellent on concrete, wood, carpet, and steel surfaces.

**PNEUMATIC**
Pneumatic casters provide a cushioned and quiet ride for fragile loads, making them ideal for rough and uneven surfaces, inside and out. Excellent on virtually all surfaces from smooth concrete to gravel.

**THERMOPLASTIC RUBBER (TPR)**
TPR casters absorb shock, and provide floor surface protection and quiet operation. Excellent on linoleum, tile, terrazzo, wood, smooth concrete, and carpet.

| DEFENDANTS' CATALOG[5] |
|---|



**Casters meeting your demands**

Select optimized casters for each product through repeated tests to provide you with most effective and durable material transport solution.

Polyolefin   Pneumatic   Thermoplastic Rubber

| DEFENDANTS' CATALOG—HORIZONTALLY FLIPPED IMAGE |
|---|



---

[4] Supp. Eibeler Decl., Ex. 1

[5] Supp. Eibeler Decl., Ex. 3.

**EXAMPLE 2**

| RUBBERMAID BROCHURE |
| --- |

## WILL NOT WARP, DENT, SPLINTER, RUST, OR ROT

Tough, resilient surface absorbs impact and provides quiet operation. Virtually maintenance-free: resistant to most chemicals, impervious to water damage, and is easily cleaned.



Metal—dents and rusts



Wood—splinters and rots

| DEFENDANTS' CATALOG |
| --- |

## Resist distortion, denting, breaking, rusting and decaying.

Tough, resilient surface absorbs impact and provides quiet operation. Virtually maintenance-free; resistant to most chemicals, impervious to water damage, and is easily cleaned.



Metal —dents and rusts.



Wood—splinters and rot

**ARGUMENT**

In light of the above facts and application of the controlling law, the Court should award the temporary relied requested by way of this motion and provided in the Proposed Order.  First, Rubbermaid is likely to prevail on the merits of this case because Rubbermaid will be able to show that Defendants are infringing Rubbermaid's Asserted Patent and Copyright.  Second, Defendants unlawful activities are causing Rubbermaid irreparable harm in the form loss of the exclusive use of Rubbermaid's patent and copyright rights, potential loss of market share, and untold harm to Rubbermaid's good will and reputation.  Third, Rubbermaid bears the greater hardship, because barring relief, it will face infringing competition and an erosion of its intellectual property rights, whereas Defendants will simply be required to observe the law of fair trade practices.  Fourth, the public interest favors entering an injunction, as public policy favors enforcing intellectual property laws and non-infringing substitute goods exist in the market.  Accordingly, Rubbermaid respectfully asks this Court should grant Rubbermaid's requested relief, as set forth in the Proposed Order.

**I.     RUBBERMAID IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Although Ninth Circuit law governs the copyright infringement claim and Federal Circuit law governs the patent claims, the factors used in determining whether to grant injunctive relief are essentially the same. The plaintiff must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) the balance of hardships tips in plaintiff's favor; and (4) injunctive relief is in the public's interest. *See AstraZeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1049 (Fed. Cir. 2010); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[6] All of these factors weigh heavily in favor of granting a temporary

---

[6] The standard for a temporary restraining order is the same as for a preliminary injunction.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

restraining order and preliminary injunction.

### A.   RUBBERMAID IS LIKELY TO SUCCEED ON THE MERITS

#### 1.   Rubbermaid is Likely to Succeed on its Patent Infringement Claim

To establish a likelihood that it will succeed on its patent infringement claim, Rubbermaid must show that it is the owner of valid design patents and that Defendants likely infringe those patents.  *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  Rubbermaid will likely be able to prove both requirements.

Rubbermaid owns the Asserted Patents by assignment from the named inventors. (Eibeler Decl. at ¶¶ 13, 22, 29, 38.)  Because Defendants have largely copied Rubbermaid's designs, Rubbermaid will likely succeed in showing that Defendants infringe the Asserted Patents.  To evaluate infringement, the Court must first construe the design patent's claim and then compare the patented and accused designs.  *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002) ("determining whether a design patent is infringed is a two-step process. First, the court must construe the design patent's claim. . . . Next, the fact-finder must compare the claim and the accused device.") (citations omitted).  Construction of a design patent must "be adapted to a pictorial setting" because design patents are "typically claimed as shown in the drawings." *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1302 (Fed. Cir. 2010).

While a court must explain the rationale for a construction, the analysis should focus on the design as a whole and need not be extensive.  *See id.* ("the Commission placed undue emphasis on particular details of its written description of the patented design.  Those details became a mistaken checklist for infringement."); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010).  Here, the claim articulated in each of the Asserted Patents is unambiguous and illustrated by the figures contained therein.

The infringement analysis next calls for determining whether the accused design is

substantially the same as the claimed design.  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993).   The Court must focus on the overall impression given by the claimed design, rather than particular ornamental details.  *Crocs*, 598 F.3d at 1303.   Accordingly, infringement of a design patent rests on whether "in the eye of an ordinary observer, giving such attention as a purchaser usually gives . . . [the] resemblance [between the claimed design and the accused product] is such as to deceive such an observer, inducing him to purchase one supposing it to be the other."  *Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665, 670 (Fed. Cir. 2008) (en banc) (quotations omitted).   Minor differences between the patented design and accused design do not prevent an infringement finding; an accused product can infringe even though it is not identical to the patented design.  *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993).

The ordinary observer test is plainly satisfied here.  "When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly." *L.A. Gear,* 988 F.2d at 1125-26.  Indeed, "[s]uch a comparison may facilitate application of the *Gorham* criterion of whether an ordinary purchaser would be deceived into thinking that one were the other." *Id.*  The overall appearances of the Accused Products are so similar to the patented design that an ordinary observer would mistake the Accused Product with the design shown in the Asserted Patents and Rubbermaid's products.

a.     *The Grandmaid Housekeeping Carts*

Here, as seen above in Table 1 (at pp. 11-12, *supra*), the stark resemblance between the Asserted Patents, Rubbermaid's products, and the Accused Products demonstrate Rubbermaid's substantial likelihood of success on the merits.  For example, the overall visual impressions of Defendants' Grandmaid Housekeeping Cart and the '570 Patent are substantially identical.  Indeed, the Grandmaid Housekeeping Cart incorporates the same overall shape, configuration,

and dimensional proportionality of Rubbermaid's patented design.  Moreover, both designs include a top shelf complete with cantilevered wings on each side of the shelf and vertical dividers that partition the surface of the top shelf.  Additionally, the bottom shelves of Defendants' Grandmaid Housekeeping Cart, Rubbermaid's Classic Housekeeping Cart, and the '570 Patent are virtually identical to each other.  The Grandmaid Housekeeping Cart also incorporates other aspects of the Rubbermaid's patented design that contribute to the overall similarities in the designs. (Eibeler Decl. at ¶¶ 16-17.)  Accordingly, an ordinary observer would find the Defendants' Accused Product to be substantially similar to the '570 Patent.  Given the overall similarities described above, Rubbermaid will be able to show the Grandmaid Housekeeping Carts infringe the '570 patent.

<em>b.      The Trust Bitbar Mobile Work Center</em>

The same can be said for the material handling carts and designs set forth in Table 1, above.  Indeed, the Bitbar Mobile Work Center is a virtual copy of the design shown in the '604 Patent and Rubbermaid's TradeMaster® Mobile Carts.  For example, all of the carts contain a rectangular cabinet having top and bottom shelves.  The ordinary observer may also note that the top shelf on all of the designs has three perimeter walls, rounded edges, and a curved handle attached to the narrow side of the cart.  The Trust Bitbar Mobile Work Center also incorporates additional aspects of the Rubbermaid's patented design that contribute to the overall similarities in the designs.  (Eibeler Decl. at ¶ 25.)  Given these similarities, an ordinary observer comparing the overall impressions of the designs likely would mistake the Trust Bitbar Mobile Work Center for the designs of the '604 Patent and the Rubbermaid TradeMaster® Mobile Cart.  Thus, Rubbermaid will be able to show that the Trust Bitbar Mobile Work Center infringes the '604 Patent.

<em>c.      The Flat Shelf Carts</em>

Like the housekeeping carts and mobile work centers, Defendants' flat shelf carts are practically replicas of Rubbermaid's '418 Patent and its Flat-Shelf Cart, which practices the '418 Patent.  Among other similarities, the '418 Patent and the Rubbermaid flat shelf cart both feature two shelves, a flat surface, and a handle that curves in one plane.  (Eibeler Decl. at ¶32.)  Because the Bitbar Flat-shelf Cart unscrupulously copies Rubbermaid's patented design, an ordinary observer would naturally confuse Defendants' cart for Rubbermaid's design.  Accordingly, Rubbermaid will be able to prevail on its infringement claim against the Bitbar Flat-shelf Cart.

### d.      The Heavy Duty Utility Carts

The '419 Patent and the Rubbermaid flat shelf cart both feature two shelves, a flat upper surface with four walls having notches, and a handle that curves in one plane.  The Trust Bitbar Utility Cart also has two shelves, a flat upper surface with four walls having notches, and a handle that curves in one plane.  The Trust Bitbar Utility Cart also incorporates additional aspects of the Rubbermaid's patented design that contribute to the overall similarities in the designs.  (Eibeler Decl. at ¶ 41.)  Because the overall appearance of the Bitbar Utility Cart is substantially the same as the design shown in the '419 patent, it is likely that an ordinary observer would mistake the two designs.  Accordingly, Rubbermaid will be able to prevail on its infringement claim against the Bitbar Utility Cart.

Further, Rubbermaid will likely succeed on showing that the Asserted Patents are valid.  The Asserted Patents enjoy a statutory presumption of validity.  *See* 35 U.S.C. §§ 171, 282; *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.,* 46 Fed. App'x 964, 983 (Fed. Cir. 2002).  And Defendants will not be able to rebut that presumption by raising a substantial question of validity.

For example, with respect to obviousness, the secondary considerations of non-

obviousness bolster a finding that the Asserted Patents are non-obvious.  *See generally Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245 (Fed. Cir. 2010) (discussing the "secondary indicia of nonobviousness" such as commercial success and copying).   First, as discussed above, Defendants have blatantly copied Rubbermaid's products, which practice Rubbermaid's Design Patents.   Defendants' deliberate copying is a secondary consideration that suggests that Rubbermaid's Design Patents are not obvious.  *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000)  (citing *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed.Cir.1984) ("The copying of an invention may constitute evidence that the invention is not an obvious one. . . .  This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed.")).

Further, the Rubbermaid products embodying the Asserted Patents have enjoyed significant commercial success, with millions of dollars of sales per year.  (Eibeler Decl. at ¶¶ 12, 21, 28.)  This commercial success of the Rubbermaid designs is a secondary consideration that suggests that Rubbermaid's Design Patents are not obvious.  *See, e.g.*, *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1344 (Fed. Cir. 2011) ("There was substantial evidence whereby a reasonable jury could have found copying and commercial success, and could have weighed these factors in favor of nonobviousness.").  Rubbermaid will be likely to succeed on proving that it owns the four Asserted Patents and that those patents are valid.  Accordingly, Rubbermaid is likely to succeed on its patent infringement claims.

### 2.   Rubbermaid Is Likely to Succeed on the Copyright Infringement Claim

Rubbermaid is also likely to prevail on the merits of its copyright infringement claim.  To succeed on this claim, Rubbermaid must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work.  *See Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991).

Rubbermaid holds proprietary rights to its Brochure, including a copyright for artwork, photographs, and textual descriptions in the Brochure.   (Supp. Eibeler Decl. at ¶ 6-7.) Rubbermaid's Brochure is advertising that is entitled to copyright protection under Section 102(a) (1) of the Copyright Act.  *See Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 147 U.S.P.Q. 264 (9th Cir. 1965) ("Counsel for appellees conceded . . . that advertising is copyrightable, as indeed he must in the face of overwhelming authority."); *cf. Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 488 n.2 (9th Cir. 1985) ("Catalogs fit the definition of 'literary works' for the purposes of the Copyright Act."), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).  To that end, on November 14, 2013, Rubbermaid filed for registration of the copyright in Brochure with the United States Copyright Office. (Eibeler Supp. Decl. at ¶ 14.)[7]

Rubbermaid will also be able to demonstrate that Defendants copied original elements of the protected Rubbermaid Brochure without Rubbermaid's authorization. Copying can be proven by direct or circumstantial evidence.  *Am. Registry of Radiologic Tech. v. Hansen*, 2008 U.S. Dist. LEXIS 100442 (C.D. Cal. Dec. 2, 2008).  Circumstantial evidence consists of a showing that (1) Defendants had access to the copyrighted work; (2) the parties' works are substantially similar. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012).  Here, Rubbermaid will be able to show that there was a "reasonable possibility" that Defendants had access to Rubbermaid's Brochure because there was "widespread dissemination" of the plaintiff's work.  *Id.* at 846-47.

In this case, Defendants undoubtedly had access to Rubbermaid's Brochure.   The

---

[7] Submitting a completed copyright application to the United States Copyright Office is sufficient to confer standing on Rubbermaid to bring a claim for copyright infringement.  *Cosmetic Ideas, Inc. v. IAC/InteractiveCorp*, 606 F.3d 612 (9th Cir. Cal. 2010): ("We therefore hold receipt by the Copyright Office of a complete application satisfies the registration requirement of § 411(a).  This interpretation ensures the broad copyright protection that the 1976 Act provided.  It "best effectuate[s] the interests of justice and promote[s] judicial economy.").

Rubbermaid Brochure has been widely disseminated.  Rubbermaid has distributed its Brochure at numerous trade shows in the United States and abroad.  (Supp. Eibeler Decl. at ¶ 4.)  And Rubbermaid uses its Brochure to sells its products to customers and distributors across the globe.  (*Id*. at ¶¶ 2, 4.)  Moreover, the Brochure is available on Rubbermaid's website.  (*Id*. at ¶ 4)  Accordingly, it is likely that Rubbermaid will be able to show that Defendants had ready access to the Brochure.  *See e.g., Rovio Entm't, Ltd. v. Royal Plush Toys, Inc.*, 2012 U.S. Dist. LEXIS 169020 (N.D. Cal. Nov. 27, 2012) (holding that access was shown where plush toys were widely distributed within and outside the United States).

Rubbermaid will also be able to show that portions of Defendants' Catalog are substantially similar to the Rubbermaid Brochure.  To determine whether two works are substantially similar, the Ninth Circuit uses a two-part test consisting of extrinsic and intrinsic components. *L.A. Printex Indus.*, 676 F.3d at 848.  The "extrinsic test" is an objective comparison of specific elements; it focuses on the "articulable similarities" between the two works. *Id.*  The "intrinsic test" is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar.  *Id.*

Here, as shown in Table 2, *supra*, Defendants' Catalog contains pages that are nearly identical to the unique artwork, images and verbal descriptions set forth in the Rubbermaid Brochure.  For example, the descriptions regarding the flatbed carts in Defendants' Catalog are substantially similar—indeed virtually identical—to those in the Rubbermaid Brochure.  (*See* Supp. Eibeler Decl. at ¶ 11).  Further, the textual descriptions of the products are identical—both describe a cart as follows:  "Tough, resilient surface absorbs impact and provides quiet operation. Virtually maintenance-free; resistant to most chemicals, impervious to water damage, and is easily cleaned." (*Compare* Supp. Eibeler Decl. Ex. 1 *with* Supp. Eibeler Decl. Ex. 3 (p. 60 of Defendants' catalog); *see* also p. 14, *supra*.)  Defendants' Catalog also uses the exact same

language to articulate the drawbacks of wood and metal:  "Metal:  dents and rusts" and "Wood:  splinters and rots[.]"  (*Id.*)

As further seen in Table 2, *supra*, the artwork and the layout of the caster images as set forth in the both the Rubbermaid Brochure and the Defendants' Catalog are again, nearly identical.  (*See* p. 13, *supra*.)  These striking similarities show that Rubbermaid is likely to succeed on its copyright infringement claim.  *Gable-Leigh, Inc. v. North Am. Miss*, 2001 U.S. Dist. LEXIS 25614 (C.D. Cal. Apr. 9, 2001) (recognizing that brochures are entitled to copyright protection, and finding a likelihood of success on the merits where "Defendants did not simply copy a few words or phrases, ideas or methods and forms, however.  Rather, substantial portions of the North American Miss 2001 handbook are verbatim or essentially verbatim copies of Gable-Leigh's copyrighted materials.").

Defendants did not create an independent form of expression in its Catalog, but instead copied Rubbermaid's creative and original work contained in the Rubbermaid Brochure.  Given the substantial similarity in the products, the Court should also find that Rubbermaid will be able to prove the extrinsic prong by showing that an ordinary, reasonable audience would also find the works substantially similar.

Finally, Rubbermaid will be able to show that Defendants are distributing their Catalog.  Indeed, the Defendants are currently distributing the Catalog to potential customers and distributors who visit Defendants' booth at ISSA.  (Supp. Eibeler Decl. at ¶ 9).  Accordingly, Rubbermaid is likely to succeed on the merits of its copyright claim.

## B.    RUBBERMAID WILL SUFFER IRREPARABLE INJURY

If Defendants are permitted to continue to promote the Accused Products, take orders, and to distribute their Catalog at ISSA—and subsequently return to China to fulfill these orders and build additional business—Rubbermaid will suffer irreparable harm.   Defendants have

knocked off the Accused Products in violation of the Asserted Patents and are distributing the illicit Catalog, to the detriment of Rubbermaid.  Defendants' roughshod run over Rubbermaid's intellectual property rights will cause irreparable harm to Rubbermaid in the form of the loss of exclusive patent and copyright rights, loss of market share that may never be able to be recovered, and immeasurable damage to Rubbermaid's good will and reputation as a market leader.

First, injuries related to Rubbermaid's potential loss of market share, and loss of exclusive patent and copyright rights cannot be readily quantified and relief may never be forthcoming.  Defendants' Accused Products are competing with the Rubbermaid products that practice the Asserted Patents.  (Eibeler Decl. at ¶ 57.)  Rubbermaid customers have pointed to the availability of the Accused Products when negotiating purchase prices with Rubbermaid. (Eibeler Decl. at ¶58.)  And Several of Rubbermaid's component suppliers have reported that Defendants have contacted them seeking to purchase the exact same parts Rubbermaid uses in its products.  (*Id.* at ¶ 59.)  Such unscrupulous competition cannot be undone or rectified by a monetary award.  As the Federal Circuit has explained, "Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction."  *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 975-76 (Fed. Cir. 1996); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (Rader, C.J.) ("mere damages will not compensate for a competitor's increasing share of the market, a market which [the patentee] competes in, and a market that [the patentee] has in part created with its investment in patented technology.").

Second, Defendants' infringement erodes and devalues Rubbermaid's intellectual property rights, thereby inflicting injury to Rubbermaid's goodwill and reputation. *See, e.g.,*

*Otter Prods. v. Anke Group Indus. Ltd.,* 2:13-cv-00029, 2013 U.S. Dist. LEXIS 159755,*6 (D. Nev. Jan. 8, 2013) (explaining that absent the requested TRO, plaintiff were likely to suffer "irreparable injury…in the form of (a) loss of control over its intellectual property rights; (b) loss of consumer goodwill; and (c) interference with [plaintiff's] ability to exploit the OTTERBOX trademarks and design patents."); *Farmer Brothers Co. v. Albrecht,* No. 2:11-CV-01371, 2011 WL 4736858, at *3 (D. Nev. Oct. 6, 2011) ("Loss of customers or goodwill constitutes irreparable harm . . ."); *see also Gallagher Benefit Servs., Inc. v. De La Torre,* 283 Fed. App'x 543, 546 (9th Cir. 2008) (potential loss of goodwill and customers causes irreparable injury). Defendants are making products that are designed to look exactly like Rubbermaid's products and Patents, and to compete with those products.  (*See* Eibeler Decl. at ¶ 57.)

Finally, because Defendants are foreign companies with no U.S. presence, any monetary judgment is likely uncollectible. *See Robert Bosch, LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1156 (Fed. Cir. 2011) (quoting the *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.* district court decision that found irreparable harm where "'all three defendants are foreign corporations and that there is little assurance that [plaintiff] could collect monetary damages'")).  In similar cases, this Court has found that money damages were insufficient in similar cases involving foreign infringers.  *E.g.*, *Aevoe Corp. v. AE Tech Co., Ltd.*, 2012 U.S. Dist. LEXIS 8248 (D. Nev. Jan. 24, 2012); *Otter Prods.,* 2013 U.S. Dist. LEXIS 159755 at *6 ("because Anke has no presence in the United States, it may be difficult or impossible for OtterBox to enforce a monetary judgment against Anke").

## C.    THE BALANCE OF HARDSHIPS WEIGHS IN RUBBERMAID'S FAVOR

"The 'balance of hardships' assesses the relative effect of granting or denying an injunction on the parties[.]"  *i4i Ltd. Partnership v. Microsoft Corp.,* 598 F.3d 831, 863 (Fed. Cir. 2010) *aff'd on other grounds by Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238,

(2011).  Here, the balance of hardships tips decidedly in Rubbermaid's favor.

First, as discussed above, Rubbermaid will suffer extensive irreparable harm absent an injunction. *See Nike, Inc. v. Meitac Int'l Enterprise Co., Ltd.,* No. 2:06-CV-00934, 2006 WL 3883278, *3 (D. Nev. Oct. 11, 2006) ("Nike will be severely handicapped in its ability to prevent further importation of infringing products, thereby destroying any potential of preserving the status quo pending a resolution of this case on its merits.").  Likewise, Rubbermaid's reputation will be harmed if Defendants are allowed to continue to sell the Accused Products because Rubbermaid will be unable to effectively police the market and enforce its intellectual property rights.  *See Cal. Med. Prods., Inc. v. Emergency Med. Prods., Inc.,* 796 F. Supp. 640, 647 (D.R.I. 1992) ("Denial of the motion for injunctive relief, therefore, would cause considerable harm to [the patentee's] reputation and threaten its market position. . . .  Accordingly, the Court finds that the potential harm to [the patentee] outweighs the potential harm to [the defendant].").  Thus, Rubbermaid will be harmed if an injunction is not granted.

Second, and perhaps most importantly, any harm that could befall Defendants as a result of a temporary restraining order or a preliminary injunction is self-inflicted.  Defendants took a calculated risk when they willfully engaged in patent and copyright infringement and then came to the United States to exhibit at ISSA. Under such circumstances, courts refuse to weigh any "harm" in the defendant's favor.  *See Celsis In Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 931 (Fed. Cir. 2012) ("the preliminary record suggests that [defendant's] losses were the result of its own calculated risk in selling a product with knowledge of [plaintiff's] patent"); *i4i v. Microsoft,* 598 F.3d at 863 (district court's permanent injunction analysis properly ignored consequences to infringer of its own infringement); *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir. 1983) (reversing denial of preliminary injunction where defendant was aware of patents and "took a calculated risk that it might infringe those patents.").  Thus, no harm is

weighed in Defendants' favor.

Because Rubbermaid will be harmed by Defendants' actions, and no harm is weighed in Defendants' favor, the balance of hardships strongly weighs in Rubbermaid's favor.

**D.   THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF**

The public interest strongly favors granting injunctive relief for two reasons. First, public policy favors protecting the rights secured by valid patents and copyrights, including the right to prevent infringement through preliminary relief. *See Smith Int'l,* 718 F.2d at 1581 ("Without the right to obtain an injunction, the right to exclude granted to the patentee [by the Constitution and Congress] would have only a fraction of the value it was intended to have").  Second, enjoining Defendant's infringing activities will not harm the public. There are other housekeeping and material handling carts on the market that do not infringe the Asserted Patents.  Thus, the public will still be able to purchase non-infringing products from others, despite an injunction against Defendants. *MGM Well Servs., Inc. v. Mega Lift Sys., LLC,* 505 F. Supp. 2d 359, 369 (S.D. Tex. 2007) (granting injunction on products for which alternatives were available in the market).

**II.   RUBBERMAID REQUESTS THAT THE COURT PERMIT SERVICE VIA EMAIL**

Rubbermaid will attempt to serve hard copies of the papers filed with the Court upon Defendants at the ISSA show.  Rubbermaid also requests that the Court enter an order permitting it to serve the present motion and supporting declaration along with the summons, complaint, proposed temporary restraining order, and notice of any hearing the Court may schedule on Defendants by email, given that Defendants are located in China. Defendant Yinshan's website indicates that the company can be contacted at trust@yinshan-brush.com.  *See* (http://www. yinshan-brush.com/about.asp.  Defendant Trust's website indicates that it can be contacted at sales@trustcommercial.com.cn.  *See*  http://www.trustcommercial.com.cn/english/contact.asp. Rubbermaid will also attempt to serve Trust's Vice President Peter Chu, who is attending the

show, by email at peter.chu@yinshan-brush.com.[8]  If the Court grants Rubbermaid's request for a temporary restraining order, the order would only remain in effect for ten days and the hearing on the preliminary injunction must occur "at the earliest possible time" prior to the expiration of the temporary restraining order. Fed. R. Civ. P. 65(b). The process of serving Defendants with the relevant documents by international mail (and through the Hague Convention) would likely take weeks.

The Ninth Circuit and this Court have permitted service by email under similar circumstances. *See*, *e.g.*, *Otter Prods.*, 2013 U.S. Dist. LEXIS 159755.  Additionally Rubbermaid will be able to obtain confirmation as to whether the Defendants actually received the email.  In the event the email is undeliverable, it will be returned to the sender by the server. Rubbermaid therefore requests that the Court enter an order permitting it to serve Defendants with the relevant documents by to the email address provided by Defendants on their respective websites set forth above.

### III.  DEFENDANTS SHOULD BE ORDERED TO SHOW CAUSE REGARDING THE ISSUANCE OF A PRELIMINARY INJUNCTION

The standard for issuance of preliminary injunction is equal to the standard for issuance of a temporary restraining order.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Rubbermaid has met its burden with respect that standard. Accordingly, Rubbermaid respectfully requests that this Court issue a show-cause order requiring Defendants to demonstrate why the Court should not issue a preliminary injunction continuing the relief granted in the temporary restraining order.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request entry of an order temporarily restraining Defendants from infringing the Rubbermaid Asserted Patents and the

---

[8] Peter Chu's contact information is provided by the ISSA mobile phone application.

Rubbermaid Brochure for the duration of ISSA, including an order restraining them from offering showing or using their catalog to offer Accused Products for sale.  The Court's order should also permit service to Defendants by email, and order that Defendants show cause regarding the issuance of a preliminary injunction and set a hearing for Plaintiffs' motion for a preliminary injunction.

Dated this 20th day of November, 2013.

COTTON, DRIGGS, WALCH,
HOLLEY, WOLOSON & THOMPSON


_____/s/ James D. Boyle_____
Brian W. Boschee, Esq. (Bar No. 07612)
bboschee@nevadafirm.com
James D. Boyle, Esq. (Bar No. 08384)
jboyle@nevadafirm.com
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

SQUIRE SANDERS (US) LLP

Steven M. Auvil (pending *PHV* admission)
steven.auvil@squiresanders.com
John R. Thuermer (pending *PHV* admission)
john.thuermer@squiresanders.com
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114


Rachael A. Harris (pending *PHV* admission)
rachael.harris@squiresanders.com
1200 19th Street, N.W., Suite 300
Washington, D.C. 20036

*Counsel for Plaintiff*
*Rubbermaid Commercial Products LLC*